Christian Contreras, SBN 330269
   CC@Contreras-Law.com
**LAW OFFICES OF CHRISTIAN CONTRERAS**
**PROFESSIONAL LAW CORPORATION**
360 E. 2nd St., 8th Floor
Los Angeles, CA 90012
Tel: (323) 435-8000

Humberto Guizar, SBN 125769
   HGuizar@GHCLegal.com
**LAW OFFICES OF HUMBERTO GUIZAR**
**A PROFESSIONAL CORPORATION**
3500 W. Beverly Blvd.
Montebello, CA 90640
Tel: (323) 725-1151; Fax: (323)-597-0101

Attorneys for Plaintiffs,
ESTATE OF ROGER MORALES, *et al.*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ROGER MORALES, by and through its successor in interest, Pauline Morales; PAULINE MORALES, individually, <br><br> Plaintiffs, <br><br> v. <br><br> LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, a public entity; ROBERT G. LUNA, in his individual and official capacities; and DOES 1 through 10, individually, <br><br> Defendants. | **CASE NO.: 2:24-cv-10144** <br><br> **COMPLAINT FOR DAMAGES** <br><br> 1. Failure to Protect from Harm – Fourteenth Amendment Violation (42 U.S.C. § 1983); <br> 2. Failure to Provide Medical Care – Fourteenth Amendment Violation (42 U.S.C. § 1983); <br> 3. Deprivation of the Right to Familial Relationship with Roger Morales (42 U.S.C. § 1983); <br> 4. Municipal Liability (*Monell*, 42 U.S.C. § 1983); <br> 5. Supervisory Liability (42 U.S.C. § 1983); <br> 6. Negligence – Wrongful Death; <br> 7. Negligence – Medical Malpractice; <br> 8. Violation of California Government Code §845.6; <br> 9. Violation of California Civil Code §52.1 (Tom Bane Act); and <br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR DAMAGES**

Plaintiffs ESTATE OF ROGER MORALES, by and through successor in interest, PAULINE MORALES and PAULINE MORALES, individually, submit the following:

## I.    INTRODUCTION

1.    This civil rights action seeks justice and damages for the death of ROGER MORALES. ROGER MORALES was a pretrial detainee who died on October 26, 2023, at the Los Angeles General Medical Center (also known as the LAC+USC Medical Center) while under the custody of the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LACSD"). This action also seeks to bring to public light the deliberate disregard for safety and protection carried out by the individual defendants in the present action.

2.    This civil rights action further seeks to establish the violations of fundamental rights under the United States Constitution, which resulted in the death of ROGER MORALES on or about October 26, 2023.

3.    Since 2023, seventy-two (72) people have died in COUNTY OF LOS ANGELES' ("COUNTY") correctional facilities, including the Los Angeles County Sheriff Men's Central Jail ("MCJ"), Twin Towers Correctional Facility, Century Regional Detention Facility, Inmate Reception Center ("IRC") and the Pitchess Detention Facilities (hereinafter collectively "COUNTY Jails").[1] The causes of death include eleven (11) overdoses, four (4) homicides resulting from inmate-on-inmate violence, three (3) suicides, twenty (20) "natural cause" deaths, two (2) undetermined deaths, and five (5) accidental deaths.

4.    ROGER MORALES' death is one of seventy-five (75) in-custody deaths at the COUNTY Jails since 2023.

---

[1] *See* https://www.vera.org/news/la-county-jail-deaths

5.     Long before ROGER MORALES' death, Defendants knew that there existed a great indifference to the safety and protection of the inmates who were in the government's custody within the COUNTY Jails.

6.     The individual Defendants named in the present lawsuit were repeatedly put on notice of the great dangers that existed within the COUNTY Jails through the long history of in-custody deaths, including multiple in-custody deaths which occurred in 2023 within IRC—the very facility where ROGER MORALES was housed within the COUNTY Jails.

7.     Indeed, the individual Defendants named in this lawsuit have been intimately familiar with the inhumane conditions existing in the COUNTY Jails. The individual Defendants have been put on notice through the various actions taken against them by federal judges in the *Rutherford* actions, dating from 1975 to the present day, wherein the ACLU exposed and continues to expose the horrific conditions permeating the COUNTY Jails.[2]

8.     The initial *Rutherford* action was filed in 1975 and served to expose the inhumane conditions at the COUNTY Jails, which were so dire that they were found to have violated the constitutional right against cruel and unusual punishment under the Eighth Amendment. In 2005, the *Rutherford* action narrowed in on the inhumane treatment of inmates housed in the IRC, which prompted District Judge Dean Pregerson to tour the IRC.  Following the tour, Judge Pregerson stated that the IRC conditions were "inconsistent with basic human values" and issued a ruling ordering Defendants to develop a comprehensive plan to improve conditions.[3]  This plan was to be overseen under the ongoing *Rutherford* consent decree.

9.     During the summer of 2022, attorneys charged with monitoring conditions under the *Rutherford* consent decree visited the IRC and witnessed abhorrent conditions, including (1) people with serious mental illness chained to chairs for days

[2] *See Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978).
[3] *See* https://www.aclusocal.org/en/news/rutherford-v-pitchess-centennial

**COMPLAINT FOR DAMAGES**

at a time, where they sleep sitting upright, (2) dozens of people crammed together, sleeping head-to-foot on the hard concrete floor, (3) people defecating in trash cans and urinating on the floor or in empty food containers in shared spaces, (4) unhygienic conditions, including floors littered with trash, overflowing sinks and toilets, no access to showers or clean clothes for days, and lack of adequate access to drinking water and food, and (5) failure to provide adequate health care, including failure to provide people with serious mental illness or chronic medical conditions their medications, or to provide care to people dangerously detoxing from drugs and alcohol.[4]

10. Consequently, in 2023, the Court in *Rutherford* issued an Order deciding to permanently prohibit Defendants from holding an incarcerated person in the IRC clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care, including but not limited to regular pill call, because of these conditions.[5]

11. Despite this long history of complete disregard for inmate safety and protection, each of the individually named Defendants in this lawsuit deliberately failed to take even modest actions to prevent in-custody deaths at the COUNTY Jails. These actions include (1) comprehensive intake screenings and evaluations, (2) diagnosis, (3) referrals to medical professionals, (4) treatment plans, (5) tracking and medical record-keeping, (6) staffing, (7) communication, and (8) quality assurance. Thus, by the time ROGER MORALES was taken into custody and placed at IRC, the jail was infested with endemic, ongoing, and unabated risks of injury or death to inmates – risks which resulted in ROGER MORALES' death on October 26, 2023.

///

---

[4] *See Rutherford v. Villanueva*, USDC Central District, Case No. CV 75-04111 DDP, Docket No. 318-1.

[5] *See* https://www.aclusocal.org/en/press-releases/aclu-reaches-landmark-settlement-la-county-jails-case

**COMPLAINT FOR DAMAGES**

## II.    JURISDICTION AND VENUE

12.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

13.    This Court has the authority to grant the requested declaratory relief pursuant to (i) 28 U.S.C. § 2201, (ii) Federal Rules of Civil Procedure, Rule 57, and (iii) the Court's inherent equitable powers.

14.    Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## III.    PENDANT CLAIMS

15.    Plaintiffs presented their government claims on April 26, 2024. The government claims were rejected on May 22, 2024. Indeed, Plaintiffs filed the instant action on the date of this Complaint, within six months of the rejection. As such, Plaintiffs have complied with the California Tort Claims Act requirements concerning their claims arising under state law.

16.    Concerning these supplemental state claims, Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims as they arise from the same facts and circumstances that underlie the federal claims.

## IV.    PARTIES

**A. Plaintiff**

17.    PAULINE MORALES is and was at all times relevant hereto, the lawful wife of ROGER MORALES, and at all times relevant hereto, was a resident of the COUNTY, California. Plaintiff PAULINE MORALES brings these claims pursuant to California Code of Civil Procedure §§ 377.20 *et seq.* and 377.60 *et seq.*, which provide for survival and wrongful death actions. Plaintiff PAULINE MORALES also brings her claims individually and on behalf of ROGER MORALES on the basis of 42 U.S.C.

§§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law. Plaintiff PAULINE MORALES brings these claims to vindicate her rights and the rights of others.

**B. Defendants**

18.    Defendant COUNTY owns, operates, manages, directs, and controls LACSD, also a separate public entity, which employs DOES 1 through 10. At all times relevant to the facts alleged herein, COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of its employees, including LACSD employees, complied with the laws and the Constitutions of the United States and the State of California.  COUNTY, through LACSD, is and was responsible for ensuring the protection and safety of all persons incarcerated at the LACSD correctional facilities, including the MCJ.

19.    COUNTY owns, operates, manages, directs, and controls LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES  (hereinafter also "LACDHS"), also a separate public entity, which employs DOES 1 through 10. At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of its employees, including the LACDHS Correctional Health Services employees (hereinafter also "CHS"), which are assigned to provide medical care to inmates housed at the COUNTY Jails, complied with the laws and the Constitutions of the United States and the State of California.  COUNTY, through LACDHS, is and was responsible for ensuring the safety of all persons incarcerated at the COUNTY Jails, including the TTCF, and providing them with appropriate medical and mental health treatment.

20.    Defendant ROBERT LUNA ("SHERIFF LUNA"), at all times mentioned herein, was the Sheriff of LACSD, the administrator of the COUNTY Jails, including TTCF, and the custodian of the pretrial detainees within it, and the ultimate policy maker for the LACSD and the COUNTY Jails.  SHERIFF LUNA and his custody staff,

**COMPLAINT FOR DAMAGES**

or those working in the jail, DOES 1 through 10, were peace officers, sergeants, captains, lieutenants, commanders and undersheriffs, doctors, nurses and/or civilian employee agents, policymakers and/or agents and representatives of the COUNTY and the LACSD, as well as employees, agents, and representatives of said Defendants. At all times relevant hereto, each of those named as DOES were acting within the course and scope of their employment, which was incidental to COUNTY's and LACSD's enterprise, and the wrongful acts hereinafter described flow from the very exercise of their authority. They are sued in their individual and official capacities. SHERIFF LUNA is sued in his official, personal, and individual capacity as a supervisory official for his culpable action or inaction in the training, supervision, or control of his subordinates or for his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others. SHERIFF LUNA's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others that he knew or reasonably should have known would cause others to inflict the constitutional injury.

21.    COUNTY, LACSD, LACDHS, and SHERIFF LUNA will hereinafter be referred to as the COUNTY DEFENDANTS.

22.    Plaintiffs are ignorant of the true names and capacities of DOES 1 through 10 ("DOE Defendants") and, therefore, sue these defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will amend their Complaint to state the names and capacities of each DOE Defendant when they have been ascertained.

23.    The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 10 are presently unknown to the Plaintiffs who, therefore, sue these defendants by fictitious names. Plaintiffs are informed, believe, and thereupon allege that DOES 1 through 10 include individual law enforcement personnel and

medical personnel employed by the LACSD and the COUNTY Correctional Health Services and that they were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiffs will amend this Complaint to substitute the DOE Defendants' true names and capacities when they have been ascertained. Plaintiffs are informed, believe, and thereupon allege that each DOE defendant is a resident of California. Upon information and belief, DOES 1 through 10 were and still are residents of the COUNTY, California. DOES 1 through 10 are sued in both their individual and official capacities.

24.    At all relevant times, DOES 7 and 8 were managerial, supervisorial, training, and/or policymaking employees of COUNTY CHS. At the time of the incident, DOES 7 and 8 were acting under color of law within the course and scope of their duties as employees for the COUNTY CHS. They had supervisorial authority over DOES 1 through 10 and the COUNTY CHS employees at the COUNTY Jails. DOES 7 and 8 were acting with complete authority and ratification of their principal, COUNTY.

25.    At all relevant times, DOES 9 and 10 were managerial, supervisorial, training, and/or policymaking employees of COUNTY. At the time of the incident, DOES 9 and 10 were acting under color of law within the course and scope of their duties as employees for the LACSD and/or the COUNTY. They had supervisorial authority over DOES 1 through 10 and the employees of the LACSD. DOES 9 and 10 were acting with the complete authority and ratification of their principal, COUNTY.

26.    Each of the Defendants, including the DOE defendants, caused and is responsible for the unlawful conduct and resulting injuries suffered by Plaintiffs by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of protesters despite the obvious need for such a policy; and by

1    ratifying the unlawful conduct that occurred by agents and officers under their direction

2    and control, including failing to take remedial or disciplinary action.

3          27.    Plaintiffs are informed and believe and thereon allege that each of the

4    Defendants was at all material times an agent, servant, employee, partner, joint venturer,

5    co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things

6    herein alleged, was acting within the course and scope of that relationship. Plaintiffs are

7    further informed and believe and thereon allege that each of the Defendants herein gave

8    consent, aid, and assistance to each of the remaining Defendants and ratified and/or

9    authorized the acts or omissions of each Defendant as alleged herein, except as may be

10   hereinafter specifically alleged. At all material times, each Defendant was jointly

11   engaged in tortious activity and an integral participant in the conduct described herein,

12   resulting in the deprivation of Plaintiffs' and ROGER MORALES' constitutional rights

13   and other harm.

14         28.    Plaintiffs are informed, believe, and thereupon allege that at all times

15   relevant hereto, Defendants, and each of them, acted as the agents, servants, and

16   employees of each of the other defendants.

17         29.    In doing each of the acts and/or omissions alleged herein, Defendants, and

18   each of them, acted within the course and scope of their employment.

19         30.    In doing each of the acts and/or omissions alleged herein, Defendants, and

20   each of them, acted under color of authority and/or under the color of law.

21   **V.    FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

22         31.    Upon information and belief, the LACSD custody staff and CHS medical

23   staff were aware that ROGER MORALES had a medical history of prediabetes,

24   hypertension, and Hepatitis C virus.

25         32.    On August 7, 2023, ROGER MORALES was taken into custody by the

26   COUNTY IRC.

27         33.    Upon information and belief, ROGER MORALES completed a

28   preliminary medical and psychological screening. He was then transferred to the

**COMPLAINT FOR DAMAGES**

detoxification center and remained there for three days before being moved to the mental observation housing at MCJ.

34.   On October 3, 2023, ROGER MORALES was court-ordered released to a program but was not released on this date. On October 17, 2023, ROGER MORALES appeared for a non-appearance court hearing and again was ordered to be released by the court but was not released on this date.

35.   Upon information and belief, on or around October 23, 2023, while in custody, ROGER MORALES fell from his wheelchair and was taken to the jail infirmary for severe hip pain. He was then transferred to the IRC until he complained of shortness of breath.

36.   On October 24, 2023, ROGER MORALES was hypotensive and experiencing an altered mental status and was transferred to Los Angeles General Medical Center.

37.   On admission, ROGER MORALES was intubated due to acute hypoxemic respiratory failure. ROGER MORALES was experiencing septic shock and had sepsis, also known as blood poisoning, due to the lack of medical care he was receiving at MCJ and subsequently at COUNTY IRC.

38.   Upon information and belief, ROGER MORALES had trouble breathing for at least two (2) days before his hospital admission. Despite clear signs of being in medical distress—including being hypotensive, in respiratory distress, noticeable bruising on his lower extremities, mental confusion, an elevated heart rate, and dangerously high glucose levels (in the 300s)—he was not promptly taken to the hospital. Given ROGER MORALES' documented history of hypertension and prediabetes, his respiratory symptoms alone warranted immediate hospitalization. The LACSD custody staff and the CHS medical staff responsible for his care and safety were well aware of these symptoms. However, DOES 1 through 10, inclusive, and each of them deliberately failed to address ROGER MORALES' health issues and medical

**COMPLAINT FOR DAMAGES**

needs.[6] ROGER MORALES' obvious symptoms and need for immediate medical care were ignored as the sepsis spread throughout his body, damaging and destroying his organs.

39.    Nevertheless, Defendants DOES 1 through 10, inclusive, and each of them willfully neglected ROGER MORALES' serious health issues and pressing medical needs. The obviousness of his condition and his need for urgent medical attention were consciously ignored, allowing the unchecked spread of sepsis to ravage his body and irreparably damage his organs.

40.    On or around October 25, 2023, PAULINE MORALES, ROGER MORALES' wife, was contacted by the Los Angeles General Medical Center and was informed that her husband was dying, to gather the family, and prepare herself.

41.    On October 26, 2023, ROGER MORALES died due to renal failure, severe sepsis, and the septic shock he experienced while in the custody and care of LACSD.

42.    Upon information and belief, ROGER MORALES repeatedly requested medical care but was ignored. Worse yet, ROGER MORALES should have been released on October 3, 2023, and October 17, 2023, which could have prevented his tragic death.

---

[6] A local government's failure to train its employees may also create § 1983 liability when the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, a plaintiff can "prov[e] a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a ***highly predictable consequence*** of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (emphasis added); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997) ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.").

43.     Upon information and belief, DOES 1 through 10 had an opportunity to observe the clear signs of ROGER MORALES' medical needs, including respiratory distress, noticeable bruising on his lower extremities, mental confusion, an elevated heart rate, and dangerously high glucose levels (in the 300s). ROGER MORALES was in desperate need of medical care; however, despite these clear signs, DOES 1 through 10 were indifferent to ROGER MORALES' health and safety.  Indeed, these failures violated Correctional Health Services Policy M211.02, which provides that the COUNTY Jails' custody and medical staff are expected to "provide continuity of care for patients who have returned from an external medical facility or agency." [7]

44.     Upon information and belief, due to the COUNTY Jails patterns and practices of not conducting proper and timely Title 15 Welfare and Safety Checks, ROGER MORALES' dire need for emergency medical intervention went unnoticed by LACSD custody and the CHS medical staff, who were responsible for monitoring and ensuring the welfare of all incarcerated persons, including ROGER MORALES.

45.     ROGER MORALES was a pretrial detainee and, therefore, innocent until proven guilty.

46.     Plaintiffs timely and properly filed tort claims with the COUNTY pursuant to California Government Code sections 910, *et seq.*, and this action is timely filed within all applicable statutes of limitation.

47.     This Complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

---

[7] A local government "may be liable if it has a 'policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). However, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; *it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy*." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)(emphasis added); *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) ("While one or two incidents are insufficient to establish a custom or policy, we have not established what number of similar incidents would be sufficient to constitute a custom or policy.") (internal citations omitted).

1
2

## VI.    FACTUAL ALLEGATIONS COMMON TO *MONELL* AND SUPERVISORIAL CAUSES OF ACTION

3      48.    Based upon the principles established in *Monell v. Dep't of Soc. Servs. of*
4  *City of New York*, 436 U.S. 658 (1978), Defendants are liable for all injuries sustained
5  by Plaintiffs as set forth herein. In *Monell v. Department of Social Servs*., 436 U.S.
6  658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities
7  were "persons" under § 1983 and thus could be held liable for causing a constitutional
8  deprivation.3 *Id.* at 690, 98 S.Ct. 2018. The Court explained that while a municipality
9  may not be held liable under § 1983 for the torts of its employees on a theory of
10 respondeat superior, liability may attach where the municipality itself causes the
11 constitutional violation through the execution of an official policy, practice, or custom.
12 *Id.* at 690–691, 98 S.Ct. 2018.[8]

13     49.    To establish municipal liability under *Monell v. Dep't of Soc. Servs. of City*
14 *of New York*, 436 U.S. 658 (1978), a plaintiff must prove: (1) that [the plaintiff]
15 possessed a constitutional right of which she was deprived; (2) that the municipality
16 had a policy/custom/practice; (3) that this policy/custom/practice amounts to deliberate
17 indifference to the plaintiff's constitutional right; and, (4) that the
18 policy/custom/practice is the moving force behind the constitutional violation.
19 *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir, 2011). The
20 policy/custom/practice "need only cause the constitutional violation; it need not be
21 unconstitutional per se." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994).
22 Recognized paths to *Monell* liability include: (1) an unconstitutional custom, practice,
23 or policy behind the violation of rights; (2) a deliberately indifferent omission, such as
24 a failure to train or failure to have a needed policy; and (3) a final policy-makers
25 involvement in or ratification of the conduct underlying the violation of rights.

26

27 [8] *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("These alleged constitutional
   deprivations were not suffered as a result of actions of the individual officers, but as a result of the
28 collective inaction of the Long Beach Police Department.").

**COMPLAINT FOR DAMAGES**

*Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-1250 (9th Cir. 2010).

**A. For Decades, Courts Have Consistently Found the COUNTY Jails to Violate the Constitutional Rights of Incarcerated Persons Held in Its IRC and Failures to Provide Adequate Resources and Living Conditions**

50.     The COUNTY Jails are the largest jail system in the United States and in the world, currently incarcerating upwards of 14,600 people. Their IRC, which is the COUNTY Jails processing hub, has hundreds of individuals pass through it daily. For five (5) decades, the Court has overseen lawsuits aimed at the barbaric facilities that the COUNTY continues to manifest.

51.     Currently, and during ROGER MORALES' incarceration, the IRC's conditions are a blatant deviation from prior Court orders, constitutional and statutory requirements, correctional standards, and human dignity and morals. The state of the IRC poses a substantial risk to all those who encounter it. More specifically, individuals detained endure unjust conditions such as:

a.  Untimely or no access to medical and mental health care, including the failure to provide emergency health care to inmates suffering from shortness of breath and septic shock;

b.  People sleep for days on the floor head-to-foot with one another or while sitting upright in chairs with no mattresses or blankets;

c.  Overcrowded, filthy, and unhygienic conditions, such as people defecating in garbage cans and urinating on the floor or in empty juice boxes;

d.  Broken toilets, sinks used as urinals, no showers or hygiene products;

e.  Inadequate nutrition and access to clean drinking water; and

f.  People with the most severe mental illness are chained to benches and chairs in the IRC for days at a time.

52.     These conditions are life-threatening. Pointedly, these very conditions at the COUNTY Jails are what led to the death of ROGER MORALES.

53.     The COUNTY's failure to take action hinders the proper functioning of the IRC and fails to protect the constitutional rights of those who are being held in COUNTY facilities, including ROGER MORALES. Specifically, the COUNTY's failure to act violates the Court's past orders and incarcerated persons' basic constitutional and statutory rights.

54.     The federal civil rights lawsuit, *Rutherford v. Pitchess*, was filed in 1975 as a class action on behalf of all present and future persons incarcerated at the COUNTY facilities. It was held in 1978 that the conditions "present poor examples of the civilized standards and concepts of dignity, humanity and decency" and found IRC conditions "constitutionally intolerable." *Rutherford v. Pitchess*, 457 F. Supp. 104, 109, 114 (C.D. Cal. 1978), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576 (1984).

55.     The Order observed that:

The sight of twenty to fifty-four men being crammed into a fourteen-foot cell is a repelling experience in any society that takes pride in its high concepts of human dignity. The closest comparison that I can draw to such a spectacle is that of an overcrowded pig pen. If the defendants find it necessary to detain a detainee in a holding cell before placing him on a bus, or after his return, they must at least give him a place to sit on a bench or a chair. *Id*. at 114.[9]

56.     Subsequent *Rutherford* orders set out specific requirements for the IRC. Specifically, in 1979, a requirement mandated that every prisoner kept overnight in the jail shall be accorded a mattress and a bed or bunk upon which to sleep. This order shall not preclude defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only. *Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D.

---

[9] Findings about IRC conditions were in the context of detainees going to and from court, when they were in the IRC for an hour or two, before returning to regular housing with mattresses, meals, and showers. *Rutherford*, 457 F. Supp. at 114. Today, these individuals spend days on end in these same conditions.

Cal. 1978), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576 (1984).

57.    On November 18, 2005, the parties stipulated, and the Court ordered, that "[e]very inmate kept overnight in the jail will be accorded a mattress and a bunk upon which to sleep. […] All bunks shall be supplied with full bedding. […] Inmates shall not be housed in any area where there is not reasonably close access to toilets." *Rutherford v. Block*, 2005 WL 3388141, at *1 ¶¶ 1-3, 5 (C.D. Cal. Nov. 18, 2005) (citing definitions of "bunk," "bed," "mattresses," and "bedding" as set forth in Titles 15 and 24 of the California Code of Regulations).

58.    On October 27, 2006, the Court issued an Order prohibiting Defendants from:

    a.  Holding an inmate in the IRC for any period over 24 hours, unless the inmate is being treated at the medical facilities within the IRC;

    b.   Holding more than 20 inmates in a holding cell without first exhausting every other means to avoid placing more than 20 inmates in a holding cell;

    c.   Holding an inmate in a cell in the IRC that is not maintained in a clean and sanitary condition, including access to a functioning toilet, potable drinking water, and clean water to wash; and

    d.  Holding an inmate in the IRC without providing ongoing access to adequate medical care, including but not limited to regular pill calls and sick calls.[10]

59.    From 2006 to 2022, the inhumane conditions continued to permeate all COUNTY Jails, prompting continued monitored visits by the ACLU pursuant to the *Rutherford* consent decree.

60.    During the summer of 2022, attorneys charged with monitoring conditions under the *Rutherford* consent decree visited the IRC and witnessed abhorrent

---

[10] *See Rutherford v. Baca*, 2006 WL 3065781, at *4 (C.D. Cal. Oct. 27, 2006).

**COMPLAINT FOR DAMAGES**

conditions, including (1) people with serious mental illness chained to chairs for days at a time, where they sleep sitting upright, (2) dozens of people crammed together, sleeping head-to-foot on the hard concrete floor, (3) people defecating in trash cans and urinating on the floor or in empty food containers in shared spaces, (4) unhygienic conditions, including floors littered with trash, overflowing sinks and toilets, no access to showers or clean clothes for days, and lack of adequate access to drinking water and food, and (5) failure to provide adequate health care, including failure to provide people with serious mental illness or chronic medical conditions their medications, or to provide care to people dangerously detoxing from drugs and alcohol.[11]  As a result of these horrific findings not being addressed, Plaintiffs in the *Rutherford v. County of Los Angeles, Alex Villanueva, et al.,* Central District of California Case No. CV 75-04111 DDP, filed to reinstate their case in September of 2022.

61.    In 2023, the Court in *Rutherford* issued an Order permanently prohibiting Defendants from holding an incarcerated person in the IRC clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care.[12] Yet, later that same year, ROGER MORALES' lack of continuous medical care led to his untimely death.

62.    Despite decades of courts finding the COUNTY Jails to violate the constitutional rights of those incarcerated, corrective action has yet to be taken.

### B. The COUNTY's Indifference to the Constitutional Violations Of Incarcerated Persons That Permeate In the COUNTY Jails

63.    Defendant SHERIFF LUNA and other COUNTY Supervisors, through their supervision of the COUNTY's medical staff, were responsible for the provision of medical services at the COUNTY Jails.

---

[11] *See Rutherford v. Villanueva*, USDC Central District, Case No. CV 75-04111 DDP, Docket No. 318-1.

[12] *See* https://www.aclusocal.org/en/press-releases/aclu-reaches-landmark-settlement-la-county-jails-case

**COMPLAINT FOR DAMAGES**

64.    In 2019, the OIG raised concerns about waiting times at the IRC. They noted that, [o]ver the course of the last two years, the OIG has frequently encountered patients who were required to wait in the IRC Clinic for more than twenty-four hours. On multiple occasions, patients waited for more than forty-eight hours. [13]

65.    In 2020, due to COVID-19, population reductions began as there were decreases in arrests and the California Judicial Council's order for zero bail for most misdemeanors and low-level felonies. These circumstances gave the COUNTY a break from IRC and Jail overcrowding.

66.    In 2021, the Jail population then rose again. In August of 2021, the OIG sounded their concerns after a week of significant overcrowding left individuals trapped for days in the IRC. At the Civilian Oversight Commission's September 23, 2021, meeting, they indicated [t]hat there was an increase in the number of incarcerated people infected with COVID-19 and that there were troublesome conditions of confinement, including people sleeping on the floor, people experiencing long wait times, medication was not immediately available, and that the area was excessively dirty and unkept.[14]

67.    In response to these concerns, the COUNTY's effort, or rather lack thereof, failed to relieve this crisis.

68.    On June 6, 2022, the Clinic Report within *Rutherford v. County of Los Angeles*, Central District of California Case No. CV 75-04111 DDP, showed 41 people there for more than 24 hours, 28 of whom had been there for more than 49 hours.

69.    It is evident from these statistics that ROGER MORALES was a number to Defendants, and his existence within the COUNTY facility was a death sentence.

---

[13] OIG 2019 Review at 3.

[14] *See* L.A. County Sheriff Civilian Oversight Commission, *Efforts to Reduce Los Angeles County Jail Population* at 1 (Oct. 21, 2021); available at https://file.lacounty.gov/SDSInter/bos/supdocs/StaffMemo-2dEffortstoReduceJailPopulation10.21.2021.pdf

70.    In *Rutherford v. County of Los Angeles*, Central District of California Case No. CV 75-04111 DDP, attorneys visited the Clinic on the day of the incident, June 6, 2022. They were "stunned by the filth and levels of tension and despair encountered." Between June 6 and August 11, 2022, Plaintiffs' counsel had numerous conversations with COUNTY officials, OIG staff, LACSD Custodial Staff, CHS staff, and two Justice Deputies for the Board of Supervisors. These efforts culminated in a meeting on August 11, 2022 with several officials. Following this meeting, it was ultimately determined that court intervention was necessary to address the catastrophe at IRC.

71.    During the 2022 summer visits, the attorneys observed dozens of inmates chained to the Front Bench attempting to sleep and hundreds of other people sleeping in the Clinic area or holding cells in IRC on floors, on metal benches, or in chairs. None had blankets or a mattress. They report that these individuals had no option but to sleep on the cold, hard floor, on metal benches, or in chairs without access to a mattress or blankets.[15] They had interviews with people being held where they described, "("[I]t is worse than being homeless. Even when I sleep on the streets, there is some room to stretch out. But in here, there are so many people walking by you or sleeping next to you that I'd rather be on the streets." *Id*.

72.    These same inmates reported that they regularly take medication but did not receive any medication while held in the IRC. It must be noted that these conditions are extremely dangerous for individuals with health conditions. It can be lethal to abruptly stop medications.

73.    Inmates also report non-existent medical care for their conditions; Ex. 3 (Dubose) ¶ 6 (his wheelchair was taken away despite difficulty walking due to a painful leg infection); Ex. 5 (Howard) ¶ 10 (asks for medical care for a toe that is cut and that he believes is broken, only given hydrogen peroxide); Ex. 8 (Perez) ¶ 8 (told medical staff he has asthma but does not have Albuterol, which he takes 3-4 times a day outside

---

[15] *See Rutherford v. County of Los Angeles*, Central District of California Case No. CV 75-04111 DDP, Dkt. No. 318-1, at 32.

jail – breathing is labored); Ex. 9 (Porter) ¶ 5 (sweating, shaking and vomiting as a result of withdrawing from heroin and crystal meth but has not received medication-assisted treatment or mental health professional evaluation); Ex. 6 (Jones) ¶ 7 (deputies ignore requests for help with alcohol withdrawal). [16]

74.     On their June 14, 2022 visit to the IRC, the counsel in *Rutherford* spoke to people in the IRC in serious medical distress, including a man who said he was an insulin-dependent diabetic, had not received insulin for 36 hours, and was only fed peanut butter and jelly sandwiches and orange juice that made his blood sugar spike and crash; a man with a fist-sized hernia doubled over in obvious pain; and a bloody open wound in one person's mouth and another with large red and swollen cut on leg.[17] On an August 26, 2022, visit, counsel saw a man in a wheelchair crying while holding up his hands, showing how they were curled up and swollen.

75.     Not to mention, these same individuals reported a denial of adequate food and water. As well as denials of showers, hygiene products, and clothing. [18]

76.     These constitutional violations existed before October 26, 2023, and continue to exist after October 26, 2023. The Defendant's indifference to these violations despite their tortuous life-threatening effects on incarcerated persons such as ROGER MORALES is unconscionable.

77.     Based on the aforementioned, Defendants SHERIFF LUNA and DOES 1 through 10 knew of the dangers that posed a risk to ROGER MORALES' safety yet disregarded these dangers, resulting in his death.

### VII.     PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS

### (Against individual Defendants SHERIFF LUNA and DOES 1 through 10)

78.     The conduct of each of the Defendants, as alleged herein, was done with reckless disregard for human life, oppression, and malice.

---

[16] *See Id.* at 34.
[17] *See Id.*
[18] *See Id.*, Dkt. No. 318-1 at 36.

79.     Long before ROGER MORALES' death, Defendants SHERIFF LUNA and DOES 1 through 10 knew that there existed a great indifference to the safety and protection of the inmates who were in the government's custody within the COUNTY Jails.

80.     Defendants SHERIFF LUNA and DOES 1 through 10 were repeatedly put on notice of the great dangers that existed within the COUNTY Jails through the long history of in-custody deaths, as detailed in Section VI above.

81.     Despite this long history of complete disregard for inmate safety and protection, Defendant SHERIFF LUNA has deliberately failed to take even modest actions to prevent in-custody deaths at the COUNTY Jails, which have for a very long time been infested with endemic, ongoing, and unabated risks of injury or death to inmates.

82.     The defendant officers, and each of them, acted with malice and oppression and with a conscious disregard for Plaintiffs' rights, making SHERIFF LUNA and DOES 1 through 10 liable for punitive damages.

## VIII.    FIRST CAUSE OF ACTION
### Failure to Protect from Harm –
### Violation of the Fourteenth Amendment to the United States Constitution
### (Survival Action – 42 U.S.C. § 1983)
### By Plaintiff ESTATE OF ROGER MORALES As Against
### Defendants DOES 1 Through 10

83.     Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

84.     Defendants COUNTY, LACSD, SHERRIF LUNA, and DOES 1 through 10 were on notice that their deficient policies, procedures, and practices alleged herein created a substantial risk of serious harm to incarcerated persons in ROGER MORALES' position.

**COMPLAINT FOR DAMAGES**

85. Each Defendant could have taken action to prevent unnecessary harm to ROGER MORALES but refused or failed to do so.

86. From October 3, 2023, through October 26, 2023, DOES 1 through 10, and each of them deliberately and knowingly chose to keep ROGER MORALES in custody despite a clear court order for his release to a designated program. This order was a condition of his continued confinement, and their failure to comply exposed ROGER MORALES to a significant and unnecessary risk of serious harm, as his lawful detention was no longer justified or required.

87. DOES 1 through 10, and each of them did not take reasonable available measures to abate or reduce that risk, even though a reasonable person in the circumstances would have released ROGER MORALES into the court-ordered program. Instead, ROGER MORALES' need for medical attention while in custody that was no longer warranted went unanswered. At the very least, a reasonable person in the circumstances should have abated or reduced the risk that ROGER MORALES faced by taking him to a hospital to immediately address his medical needs instead of keeping him waiting at the IRC. Clearly, by not taking such measures, DOES 1 through 10 caused ROGER MORALES' death.

88. Furthermore, by policy, procedure, and practice, DOES 1 through 10 deliberately disregarded the hazards and risks posed to persons incarcerated at MCJ and IRC, as alleged above. Defendants DOES 1 through 10 failed to take any reasonable steps to mitigate the obvious and well-known risks of harm that were attendant to housing ROGER MORALES at MCJ and by failing to continue to monitor him while at IRC.

89. DOES 1 through 10 routinely failed to conduct proper required welfare and safety checks at the COUNTY Jails, including MCJ and IRC, and failed to take sufficient actions to correct this problem and ensure that necessary checks were performed.0

**COMPLAINT FOR DAMAGES**

90.     Defendants, including SHERIFF LUNA and DOES 8 through 10, failed to take corrective action, discipline, or remove the command staff at the COUNTY Jails, including MCJ and IRC, who, upon information and belief, directed the deputies to falsify safety check logs and violate the COUNTY's safety check policies. SHERIFF LUNA and DOES 8 through 10 ratified their actions and the practices used under their watch.

91.     Defendants, including SHERIFF LUNA and DOES 8 through 10, failed to properly train and supervise LACSD custody, medical and mental health staff regarding policies, procedures, and practices necessary for the protection of inmates from risks and hazards existing within the COUNTY Jails, including MCJ and IRC.

92.     Defendants, including SHERIFF LUNA and DOES 8 through 10, failed to correct their policies, procedures, and practices despite notice of significant and dangerous problems demonstrating deliberate indifference to the inmates in their care.

93.     Defendants, including SHERIFF LUNA and DOES 8 through 10, ratified the actions and inactions of DOES 1 through 10 amounting to constitutional violations.

94.     DOES 1 through 10 showed deliberate indifference to the risk of harm to ROGER MORALES by failing to perform the required safety checks and take immediate action when he exhibited clear signs of medical distress, especially given ROGER MORALES' medical history.

95.     SHERIFF LUNA and DOES 8 through 10 ratified DOES 1 through 10's failure to conduct safety checks and falsification of logs.

96.     As a direct and proximate result of Defendants' conduct, the civil rights of ROGER MORALES, as protected by the Fourteenth Amendment of the United States Constitution, were violated. Further, ROGER MORALES experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

97.     Defendants subjected ROGER MORALES to their wrongful conduct, depriving ROGER MORALES of rights described herein, knowingly, maliciously, and

1   with conscious and reckless disregard for whether the rights and safety of ROGER

2   MORALES and others would be violated by their acts and/or omissions.

3       98.    As a direct and proximate result of Defendants' acts and/or omissions as

4   set forth above, ROGER MORALES, through Plaintiffs herein, sustained injuries and

5   damages.

6       99.    The conduct of Defendants entitles Plaintiffs to punitive damages and

7   penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiffs do not

8   seek punitive damages against COUNTY.

9       100.   Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42

10  U.S.C. § 1988 and other applicable United States and California codes and laws.

11                    **IX.    SECOND CAUSE OF ACTION**

12                       **Failure to Provide Medical Care –**

13  **Violation of the Fourteenth Amendment to the United States Constitution**

14                    **(Survival Action – 42 U.S.C. § 1983)**

15              **By Plaintiff ESTATE OF ROGER MORALES As Against**

16                   **Defendants DOES 1 Through 10**

17      101.   Plaintiffs reallege and incorporate herein by reference each of the

18  preceding paragraphs of this Complaint and any subsequent paragraphs.

19      102.   By the actions and omissions described above, DOES 1 through 10, as

20  alleged herein, violated 42 U.S.C. § 1983, depriving ROGER MORALES, through

21  Plaintiff herein, of the following clearly established and well-settled constitutional

22  rights protected by the Fourth and Fourteenth Amendments to the United States

23  Constitution: ROGER MORALES' right to be free from deliberate indifference to

24  ROGER MORALES' serious medical health needs while in custody as a pretrial

25  detainee as secured by the Fourth and/or Fourteenth Amendments.

26      103.   Indeed, before ROGER MORALES' hospitalization on October 24, 2023,

27  it was unmistakably evident that ROGER MORALES was in severe medical distress

28  and urgently required care. Despite this, DOES 1 through 10 willfully and intentionally

**COMPLAINT FOR DAMAGES**

1  neglected to provide him with any medical attention. Even more egregiously, after a
2  court ordered his release to a treatment program on October 3, 2023, ROGER
3  MORALES remained in custody, deprived of both his freedom and essential medical
4  care.

5  104.   Despite clear signs of being in medical distress—including respiratory
6  distress, noticeable bruising on his lower extremities, mental confusion, an elevated
7  heart rate, and dangerously high glucose levels (in the 300s)—he was not promptly
8  taken to the hospital. Given Mr. Morales's documented history of hypertension and
9  prediabetes, his respiratory symptoms alone warranted immediate hospitalization.

10  105.   Upon information and belief, two days before his hospitalization, ROGER
11  MORALES experienced difficulty breathing and pleaded for medical help, yet his
12  requests were ignored. Defendants' deliberate indifference only intensified as he
13  showed unmistakable signs of septic shock, but they still took no action, further
14  compounding their disregard for his life and safety. By the time he was finally
15  hospitalized, he required intubation for acute hypoxemic respiratory failure.

16  106.   DOES 1 through 10, and each of them did not take reasonable available
17  measures to abate or reduce that risk, even though a reasonable person in the
18  circumstances would have released ROGER MORALES into the court-ordered
19  program. Instead, ROGER MORALES' need for medical attention while in custody
20  that was no longer warranted went unanswered. At the very least, a reasonable person
21  in the circumstances should have abated or reduced the risk that ROGER MORALES
22  faced by taking him to a hospital to immediately address his medical needs instead of
23  keeping him waiting at the IRC. Clearly, by not taking such measures, DOES 1 through
24  10 caused ROGER MORALES' death.

25  107.   By the actions and omissions described above, Defendants DOES 1
26  through 10, as alleged herein, including but not limited to their failure to provide
27  ROGER MORALES with appropriate emergency medical care, along with the acts
28  and/or omissions of Defendants in failing to train, supervise, and/or promulgate

1 | appropriate policies and procedures to provide emergency medical and mental health
2 | care and life-saving care to persons in their custody, constituted deliberate indifference
3 | to ROGER MORALES' serious medical and mental health needs, health, and safety.

4 |     108.   As a direct and proximate result of Defendants' conduct, the civil rights
5 | of ROGER MORALES, as protected by the Fourteenth Amendment of the United
6 | States Constitution, were violated. Further, ROGER MORALES experienced physical
7 | pain, severe emotional distress, and mental anguish, as well as loss of his life and other
8 | damages alleged herein.

9 |     109.   Defendants subjected ROGER MORALES to their wrongful conduct,
10 | depriving ROGER MORALES of rights described herein, knowingly, maliciously, and
11 | with conscious and reckless disregard for whether the rights and safety of ROGER
12 | MORALES and others would be violated by their acts and/or omissions.

13 |     110.   As a direct and proximate result of Defendants' acts and/or omissions as
14 | set forth above, ROGER MORALES, through Plaintiff herein, sustained injuries and
15 | damages.

16 |     111.   The conduct of Defendants entitles ESTATE OF ROGER MORALES to
17 | punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by
18 | law. ESTATE OF ROGER MORALES does not seek punitive damages against
19 | COUNTY.

20 |     112.   ESTATE OF ROGER MORALES is also entitled to reasonable costs and
21 | attorneys' fees under 42 U.S.C. § 1988 and other applicable United States and
22 | California codes and laws.

### X.    THIRD CAUSE OF ACTION

**Deprivation of the Right to Familial Relationship With ROGER MORALES –**
**Violation of the Fourteenth Amendment to the United States Constitution**
**(42 U.S.C. § 1983)**

**By Plaintiff PAULINE MORALES As Against Defendants DOES 1 Through 10**

28 |     113.   Plaintiffs reallege and incorporate herein by reference each of the

**COMPLAINT FOR DAMAGES**

1    preceding paragraphs of this Complaint and any subsequent paragraphs.

2    114.   The aforementioned acts and/or omissions of DOES 1 through 10 being

3    deliberately indifferent to ROGER MORALES' protection, safety, and serious medical

4    needs, violating ROGER MORALES' constitutional rights, and their failure to train,

5    supervise, and/or take other appropriate measures to prevent the acts and/or omissions

6    that caused the untimely and wrongful death of ROGER MORALES deprived

7    PAULINE MORALES of her liberty interests in the familial relationship with ROGER

8    MORALES in violation of their substantive due process rights as defined by the

9    Fourteenth Amendments of the Constitution.

10    115.   All of the acts of DOES 1 through 10 were done under color of state law.

11    116.   The acts and omissions of each DOES 1 through 10  deprived PAULINE

12    MORALES of rights, privileges, and immunities secured by the Constitution and laws

13    of the United States, including but not limited to the Fourteenth Amendment by, among

14    other things, depriving PAULINE MORALES of her right to a familial relationship

15    with ROGER MORALES without due process of law by their deliberate indifference

16    in denying ROGER MORALES protection and safety while incarcerated at MCJ and

17    access to medical care while suffering a medical emergency at IRC.

18    117.   DOES 1 through 10 and the other involved agents and employees acted

19    pursuant to expressly adopted official policies or longstanding practices or customs of

20    the COUNTY and LACSD. These include policies and longstanding practices or

21    customs of failing to provide persons in pretrial custody who are experiencing medical

22    emergencies access to medical care as stated above and incorporated herein.

23    118.   In addition, the training policies of the COUNTY and LACSD were not

24    adequate to train its deputies, agents, and employees to handle the usual and recurring

25    situations with which they must deal with, including but not limited to encounters with

26    individuals in pretrial custody who are experiencing medical emergencies. These

27    Defendants and each of them knew that its failure to adequately train its COUNTY

28    custody, medical, and mental health staff, including other agents and employees, to

27

**COMPLAINT FOR DAMAGES**

interact with individuals suffering from medical emergencies made it highly predictable that its custody, medical, and mental health staff would engage in conduct that would deprive persons such as ROGER MORALES, and thus PAULINE MORALES of her rights. These Defendants were thus deliberately indifferent to the obvious consequences of their failure to train their deputies, agents, and employees adequately.

119.   COUNTY and LACSD's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of PAULINE MORALES and ROGER MORALES by each Defendants' official policies and/or longstanding practices or customs are so closely related to ROGER MORALES' injuries and death and thus the deprivation of the rights of Plaintiffs as to be the moving force causing those injuries.

120.   SHERIFF LUNA, a final policymaker for the COUNTY and LACSD, ratified the actions and omissions of DOES 1 through 10, all of whom were custody, medical, and mental health staff at the COUNTY Jails, including MCJ and IRC, in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

121.   As a direct and proximate result of Defendants' conduct, the civil rights of ROGER MORALES, as protected by the Fourteenth Amendment of the United States Constitution, were violated. Further, ROGER MORALES experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

122.   Defendants subjected ROGER MORALES to their wrongful conduct, depriving ROGER MORALES of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of ROGER MORALES and others would be violated by their acts and/or omissions.

123.   As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damages.

124.   The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiffs do not seek punitive damages against COUNTY.

125.   PAULINE MORALES is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and other applicable United States and California codes and laws.

## XI.   FOURTH CAUSE OF ACTION
### Municipal Liability
### (*Monell* - 42 U.S.C. § 1983)
### By Plaintiff ESTATE OF ROGER MORALES As Against
### Defendants COUNTY, LACSD and LACDHS

126.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

127.   In *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities were "persons" under § 1983 and thus could be held liable for causing a constitutional deprivation. *Id.* at 690, 98 S.Ct. 2018. The Court explained that while a municipality may not be held liable under § 1983 for the torts of its employees on a theory of respondeat superior, liability may attach where the municipality itself causes the constitutional violation through the execution of an official policy, practice, or custom. *Id.* at 690–691, 98 S.Ct. 2018.[19]

128.   At all times relevant hereto, the COUNTY custody, medical, and mental health staff were required to adhere to and enforce the following policies and procedures:

    a.   To deny pretrial detainees and other inmates access to timely, appropriate, competent, and necessary care for serious medical needs, requiring such

---

[19] *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("These alleged constitutional deprivations were not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the Long Beach Police Department.").

inmates in crisis to remain untreated in jail instead of providing for their emergency medical needs;

b.    To allow and permit deputies doing regular cell checks on inmates, including in safety cells, to fail to document their actual observations of the inmate's condition and status, in violation of the COUNTY's written policies and state law;

c.    To allow and permit inadequate and incompetent medical care for jail inmates and arrestees;

d.    To hire, retain, and contract for obviously inadequate medical care for jail inmates and arrestees, including creating financial incentives for custodial and medical personnel not to send inmates with emergency medical needs to a hospital;

e.    To allow, permit, and require medical staff, including licensed vocational nurses and registered nurses, to work outside their legal scope of practice and without appropriate supervision;

f.    To fail to train custody staff that medical staff, including licensed vocational nurses are not competent to assess or decide inmates' medical conditions, medical needs, or whether the inmate should be permitted to remain in jail versus being sent to a hospital;

g.    To allow, permit, and require unlicensed, incompetent, inadequately trained and/or inadequately supervised staff to assess inmates' medical condition, needs, and treatment, including to decide whether or not to provide inmates with necessary emergency care and hospitalization;

h.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling persons in medical crisis;

i.    To cover up violations of constitutional rights by any or all of the following:

**COMPLAINT FOR DAMAGES**

   i. By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical care at the jail;

   ii. By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by custodial and medical personnel;

   iii. By turning a blind eye to custodial and medical personnel who direct, aid, and/or assist with the distribution of hazards, including illicit drugs, into the COUNTY Jails; and

   iv. By allowing, tolerating, and/or encouraging custodial and medical personnel to: fail to file complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

  j. To allow, tolerate, and/or permit a "code of silence" among law enforcement officers, LACSD personnel, custodial personnel, and CHS medical personnel at the jail whereby an officer or member of the LACSD or CHS medical staff does not provide adverse information against a fellow officer, or member of the LACSD or CHS medical staff;

  k. To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in subparagraphs (a) through (j) above, with deliberate indifference to the rights and safety of pretrial detainees, such as ROGER MORALES, and in the face of an obvious need for such policies, procedures, and training programs.

  129. The unconstitutional actions and/or omissions of DOES 1 through 10, as well as other employees or officers employed by or acting on behalf of the COUNTY,

LACSD, and LACDHS on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY, LACSD, and LACDHS, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for COUNTY, LACSD, and LACDHS, including SHERIFF LUNA:

    a.    To fail to properly and adequately hire, train, supervise, and monitor custodial and medical personnel at the Jails;

    b.    To fail to use appropriate and generally accepted law enforcement procedures for handling persons in medical crisis;

    c.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling persons in medical crisis;

    d.    To cover up violations of constitutional rights by any or all of the following:

        i.    By failing to properly investigate and/or evaluate complaints or incidents of handling of persons in medical crisis;

        ii.    By ignoring and/or failing to properly and adequately investigate and/or discipline unconstitutional or unlawful law enforcement activity; and

        iii.    By allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate reports; file false reports; make false statements; intimidate, bias, and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful law enforcement conduct by withholding and/or concealing material information;

**COMPLAINT FOR DAMAGES**

e.     To allow, tolerate, and/or permit a "code of silence" among law enforcement officers whereby an officer does not provide adverse information against a fellow law enforcement officer;

f.     To allow, tolerate, and/or permit a "code of silence" among custodial and medical personnel at the COUNTY Jails whereby custodial and medical personnel do not provide adverse information against a fellow staffer;

g.     To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in subparagraphs (a) through (g) above, with deliberate indifference to the rights and safety of pretrial detainees, such as ROGER MORALES, and in the face of an obvious need for such policies, procedures, and training programs.

130.   Defendants COUNTY, LACSD, and LACDHS, through their employees and agents, and their policy-making supervisors, SHERIFF LUNA and DOES 8 through 10, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants DOES 1 through 10, and other COUNTY, LACSD, and LACDHS personnel, with deliberate indifference to the constitutional rights of ROGER MORALES, Plaintiff and others in similar positions, as described above, and therefore, those rights thereby violated.

131.   Before the death of ROGER MORALES, high-level COUNTY supervisors, including SHERIFF LUNA, knew or should have known of history, dating back to the Ford Administration, with years of notice of ongoing failure to routinely check in on incarcerated individuals, especially those held in the IRC, knew or should have known of inadequate and/or incompetent staffing, insufficient and inadequate training/supervision/control, excessive overcrowding, including in the IRC, the hiring of deputies in jails who exhibit deliberate indifference and reckless disregard to the safety of other incarcerated persons, the subjection of violence in jails perpetrated by

1  other incarcerated persons, and failure to take corrective measures, training deputies to
2  monitor detainees and incarcerated persons and immediately respond to it, and failing
3  to adequately control and discipline deputies involved in misconduct. The number of
4  those actions is troubling and demonstrative of Defendants' years of deliberate
5  indifference to protect detainees and incarcerated persons from unnecessary harm and
6  their failure to take corrective action.

7       132.   The unconstitutional actions and/or omissions of DOES 1 through 10 and
8  other LACSD custody and medical staff, as described above, were approved, tolerated,
9  and/or ratified by policymaking officers for the COUNTY and LACSD, including
10 SHERIFF LUNA and DOES 8 through 10. Plaintiff is informed and believes and
11 thereon alleges that the details of this incident have been revealed to the authorized
12 policymakers within the COUNTY, LACSD, and LACDHS and that such
13 policymakers have direct knowledge of the fact that the death of ROGER MORALES
14 was the result of deliberate indifference to his rights to be protected and safe while in
15 the custody of the COUNTY, LACSD, and LACDHS, and his rights to have access to
16 medical care when suffering a medical emergency. Notwithstanding this knowledge,
17 the authorized policymakers within the COUNTY, LACSD, and LACDHS have
18 approved of the conduct and decisions of DOES 1 through 10 in this matter and have
19 made a deliberate choice to endorse such conduct and decisions and the basis for them
20 that resulted in the death of ROGER MORALES. By so doing, the authorized
21 policymakers within the COUNTY, LACSD, and LACDHS have shown affirmative
22 agreement with the individual Defendants' actions and have ratified the
23 unconstitutional acts of the individual Defendants. Furthermore, Plaintiffs are informed
24 and believe, and thereupon allege, that SHERIFF LUNA and DOES 8 through 10, and
25 other policy-making officers for the COUNTY, LACSD, and LACDHS were and are
26 aware of a pattern of misconduct and injury caused by COUNTY Jails custody and
27 medical staff similar to the conduct of Defendants described herein, but failed to
28 discipline culpable custody and medical staff and failed to institute new procedures and

policy within the COUNTY, LACSD, and LACDHS.

133.   Long before ROGER MORALES' death, each of the individually named Defendants from the COUNTY, LACSD, and LACDHS knew that there existed a great indifference to the safety and protection of the incarcerated persons who were in the government's custody within the COUNTY Jails, specifically those in the IRC.

134.   Indeed, Defendants were repeatedly put on notice of the great dangers that existed within the COUNTY Jails through the long history of in-custody deaths, including multiple in-custody deaths that occurred in 2023 *within* the IRC—the very facility within the COUNTY Jails where ROGER MORALES was transferred to while experiencing breathing problems.

135.   Defendants have been intimately familiar with the inhumane conditions existing in the COUNTY Jails and, more specifically, in the IRC.  Defendants have been put on notice through the various actions taken against them in the *Rutherford* actions, dating from 1975 to the present day, wherein the ACLU exposed and continues to expose, the horrific conditions of COUNTY Jails.[20]

136.   The initial *Rutherford* action was filed in 1975 and served to expose the inhumane conditions at the COUNTY Jails, which were so dire that they were found to have violated the constitutional right against cruel and unusual punishment under the Eighth Amendment.  In 2005, the *Rutherford* action narrowed in on the inhumane treatment of inmates housed in the IRC, which prompted District Judge Dean Pregerson to tour the IRC.  Following the tour, Judge Pregerson stated that the IRC jail conditions were "inconsistent with basic human values" and issued a ruling ordering Defendants to develop a comprehensive plan to improve conditions.[21]  This plan was to be overseen under the ongoing *Rutherford* consent decree.

137.   During the summer of 2022, attorneys charged with monitoring conditions under the *Rutherford* consent decree visited the IRC and witnessed abhorrent

---

[20] *See Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978).
[21] *See* https://www.aclusocal.org/en/news/rutherford-v-pitchess-centennial

conditions, including (1) people with serious mental illness chained to chairs for days at a time, where they sleep sitting upright, (2) dozens of people crammed together, sleeping head-to-foot on the hard concrete floor, (3) people defecating in trash cans and urinating on the floor or in empty food containers in shared spaces, (4) unhygienic conditions, including floors littered with trash, overflowing sinks and toilets, no access to showers or clean clothes for days, and lack of adequate access to drinking water and food, and (5) failure to provide adequate health care, including failure to provide people with serious mental illness or chronic medical conditions their medications, or to provide care to people dangerously detoxing from drugs and alcohol.[22]

138.   Consequently, in 2023, the Court in *Rutherford* issued an Order deciding permanently prohibited Defendants from holding an incarcerated person in the IRC clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care, including but not limited to regular pill call, because of these conditions.[23]

139.   Despite this long history of complete disregard for inmate safety and protection, Defendants deliberately failed to take even modest actions to prevent in-custody deaths at the COUNTY Jails. These actions include (1) comprehensive intake screenings and evaluations, (2) diagnosis, (3) referrals to medical professionals, (4) treatment plans, (5) tracking and medical record-keeping, (6) staffing, (7) communication, and (8) quality assurance. Thus, by the time ROGER MORALES was taken into custody and placed at IRC, the jail was infested with endemic, ongoing, and unabated risks of injury or death to inmates – risks which indeed resulted in ROGER MORALES' death on October 26, 2023.

---

[22] *See Rutherford v. Villanueva*, USDC Central District, Case No. CV 75-04111 DDP, Docket No. 318-1.

[23] *See* https://www.aclusocal.org/en/press-releases/aclu-reaches-landmark-settlement-la-county-jails-case

**COMPLAINT FOR DAMAGES**

140. The Defendants' deliberate indifference toward pretrial detainees suffering from medical issues resulted in many unnecessary deaths starting in 2018. From January 2018 through March 2023, twenty-six (26) inmates have died from medical complications within the COUNTY Jails:

141. In 2018, Daniel Arteaga, a 27-year-old male, died as a result of medical/mental health complications. Mr. Arteaga had only been incarcerated for approximately three weeks before his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Arteaga was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

142. In 2018, Steven Thach died as a result of medical/mental health complications. Mr. Thach was only 24 years old at the time of his death. Mr. Thach had a known history of schizophrenia. Mr. Thach was not found unresponsive until after custodial staff delivered snacks to inmates in their cells on March 28, 2023. He was pronounced dead at the scene. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Thach was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

143. In 2018, Alberd Tersargyan died as a result of medical/mental health complications. Mr. Tersargyan was 81 years old at the time of his death. He had been incarcerated since 2010. On April 1, 2018, Mr. Tersargyan was found unresponsive in his cell during an inmate check. He was subsequently transported to the hospital in cardiac arrest. Mr. Tersargyan was pronounced dead at the hospital later that evening. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Tersargyan was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

144. In 2018, Lewis Nyarecha died as a result of medical/mental health complications. Mr. Nyarecha was a 25-year-old pretrial detainee who had been in

1   custody at the COUNTY jail for less than one month before his death. On August 28,
2   2018, Mr. Nyarecha was found unresponsive in his cell in a rigor mortis state, which
3   was indicative of a muscle spasm likely induced by his ingestion of quetiapine, a
4   medication commonly used to treat schizophrenia. Mr. Nyarecha was pronounced dead
5   at the scene. Upon information and belief, the custody staff's failure to properly
6   supervise/monitor and the medical staff's failure to provide medical care to Mr.
7   Nyarecha was a result of the unconstitutional customs and practices permeating the
8   COUNTY Jails.

9       145.   In 2018, died as a result of medical/mental health complications. Mr.
10  Paredes was 30 years old at the time of his death. He had a history of mental illness,
11  specifically depression. He had been incarcerated for less than 24 hours before his
12  death. Mr. Paredes was pronounced dead at the scene despite resuscitative efforts.
13  Upon information and belief, the custody staff's failure to properly supervise/monitor
14  and the medical staff's failure to provide medical care to Mr. Paredes was a result of
15  the unconstitutional customs and practices permeating the COUNTY Jails.

16      146.   In 2019, Thomas Banuelos, a 30-year-old male, died as a result of
17  medical/mental health complications. It is estimated that Mr. Banuelos was on the floor
18  unresponsive for approximately 30 minutes. Mr. Banuelos was transported to the
19  hospital, where he was later pronounced dead. Mr. Banuelos had been incarcerated for
20  less than two weeks before his death. Upon information and belief, the custody staff's
21  failure to properly supervise/monitor and the medical staff's failure to provide medical
22  care to Mr. Banuelos was a result of the unconstitutional customs and practices
23  permeating the COUNTY Jails.

24      147.   In 2019, pretrial detainee Jeffrey Barnett died while in custody at the
25  TTCF due to medical/mental health complications. Mr. Barnett was 53 years old at the
26  time of his death.  Upon information and belief, the custody staff's failure to properly
27  supervise/monitor and the medical staff's failure to provide medical care to Mr. Barnett
28

**COMPLAINT FOR DAMAGES**

1    was a result of the unconstitutional customs and practices permeating the COUNTY

2    Jails.

3        148.    In 2019, Cody Jones, a 25-year-old male, died as a result of

4    medical/mental health complications. Mr. Jones was transported to the hospital, where

5    he was subsequently pronounced dead.   Upon information and belief, the custody

6    staff's failure to properly supervise/monitor and the medical staff's failure to provide

7    medical care to Mr. Jones was a result of the unconstitutional customs and practices

8    permeating the COUNTY Jails.

9        149.    In 2019, Patrick Clancy passed away in a nursing home after being placed

10   on hospice care. Approximately one year prior, Mr. Clancy was found dead in his cell

11   while in custody at the TTCF. Mr. Clancy was initially transported to the hospital,

12   where he was placed on a ventilator and never regained consciousness. While at Twin

13   Towers, Mr. Clancy was in a mental health unit. Mr. Clancy was 59 years old at the

14   time of his death on November 19, 2019.   Upon information and belief, the custody

15   staff's failure to properly supervise/monitor and the medical staff's failure to provide

16   medical care to Mr. Clancy was a result of the unconstitutional customs and practices

17   permeating the COUNTY Jails.

18       150.    In 2020, Michael Zivalich, a 31-year-old male, died as a result from

19   medical/mental health complications. On July 19, 2020, Mr. Zivalich was found dead

20   in his cell. Mr. Zivalich had a known history of depression and attention deficit

21   disorder. Upon information and belief, the custody staff's failure to properly

22   supervise/monitor and the medical staff's failure to provide medical care to Mr.

23   Zivalich was a result of the unconstitutional customs and practices permeating the

24   COUNTY Jails.

25       151.    In 2020, Roberto Escobar died as a result from medical/mental health

26   complications. Mr. Escobar was found unresponsive by another inmate and not by

27   custodial staff. As a result of the incident, Mr. Escobar suffered multiple blunt-force

28   injuries to his head and neck. On November 18, 2020, Mr. Escobar succumbed to these

injuries after being hospitalized for approximately one month. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Escobar was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

152. In 2020, Vincent Nelson died as a result of medical/mental health complications at MCJ. On December 18, 2020, Mr. Nelson was found dead in his cell. Mr. Nelson was transported to the Los Angeles General Medical Center, where he was diagnosed with an anoxic brain injury. Four days later, Mr. Nelson succumbed to his injuries and died on December 22, 2020. Mr. Nelson was 27 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Nelson was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

153. In 2021, Lorenzo Anguino died as a result of medical/mental health complications Mr. Anguino was pronounced dead on January 8, 2021. The mechanism of death was asphyxiation (i.e., choking). Mr. Anguino was 27 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Anguino was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

154. In 2021, Mark Carrillo died as a result of medical/mental health complications at MCJ. Mr. Carrillo had been housed at MCJ for a month before his death. During that month, Mr. Carillo engaged in alarming behavior, which caused him to be housed in a single-man cell. Mr. Carillo was 38 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Carrillo was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

155.   In 2021, Donry Bernabe died as a result of medical/mental health complications at LACSD station jail. On February 16, 2021, Mr. Barnabe was arrested by LACSD sheriff's deputies and booked at the LACSD Palmdale Station Jail. Hours later, an inmate observed Mr. Bernabe praying on his knees as he faced his cell wall. Mr. Bernabe was then found dead inside his cell. Mr. Bernabe was 50 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Bernabe was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

156.   In 2021, Wilson Barrios died as a result of medical/mental health complications at MCJ. Mr. Barrios was transported to the Los Angeles General Medical Center, where he was diagnosed with global brain damage from anoxia. Three weeks following being found unresponsive, Mr. Barrios succumbed to his injuries and died on March 20, 2021. Mr. Barrios was 26 years old at the time of his death.  Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Barrios was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

157.   In 2021, Angel Sapien died as a result from medical/mental health complications at MCJ. On March 12, 2021, Mr. Sapien was found in his cell unresponsive. Mr. Sapien was 34 years old at the time of his death.  Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Sapien was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

158.   In 2021, Sam Do died as a result from medical/mental health complications at TTCF. Mr. Do had been in the LACSD's custody since January 2020 to the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to

**COMPLAINT FOR DAMAGES**

Mr. Do was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

159.    In 2021, Darlene Carlisle died as a result of medical/mental health complications at the LACSD Lynwood Jail. On May 20, 2021, Ms. Carlisle was found in her cell dead. Ms. Carlisle was 58 years old at the time of her death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Ms. Carlisle was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

160.    In 2021, Alejandro Esparza died as a result of medical/mental health complications at TTCF. Mr. Esparza was only 23 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Esparza was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

161.    In 2021, Aaron Crawford exhibited suicidal behavior. Indeed, Mr. Crawford had exhibited suicidal behavior for an appreciable amount of time before his death; however, the TTCF custody and medical staff were indifferent towards his mental health needs. Mr. Crawford was 36 years old at the time of his death. Upon information and belief, the custody staff's failure to properly supervise/monitor and the medical staff's failure to provide medical care to Mr. Crawford was a result of the unconstitutional customs and practices permeating the COUNTY Jails.

162.    In 2022, Winford Carter, a 36-year-old male, was found unresponsive and face down in his cell approximately one week after being booked at TTCF. Upon booking, Mr. Carter was placed alone in a cell in the High Observation Housing Unit at Twin Towers due to his history of mental illness. Mr. Carter was diagnosed with schizoaffective disorder and paranoid schizophrenia. According to the Deputy Medical Examiner and autopsy report, the "stress of being placed in custody exacerbated [Mr. Carter's] mental condition." Because the TTCF custody staff failed to conduct proper Title 15 safety checks and because the TTCF medical staff failed to provide adequate

1  medical care, Mr. Carter died in custody.  The custody and medical staff's failure to
2  provide medical care to Mr. Carter was a result of the unconstitutional customs and
3  practices permeating the COUNTY Jails.

4        163.   In 2022, Joseph Posard died as a result of medical/mental health
5  complications at the Twin Towers Correctional Facility.  Indeed, Mr. Posard exhibited
6  signs of suicidality.  Instead of placing Mr. Posard in a safety cell, and because TTCF
7  was overcrowded, the TTCF custody and medical staff placed Mr. Posard in a
8  makeshift cell, which was essentially the overflow hospital room.  Because the TTCF
9  custody staff failed to conduct proper Title 15 safety checks, and because the TTCF
10  medical staff failed to provide adequate medical care to Mr. Posard while housed at
11  TTCF, Mr. Posard committed suicide in the hospital room by creating a noose out of
12  an electrical cord belonging to one of the hospital beds.  The custody and medical
13  staff's failure to provide medical care to Mr. Posard was a result of the unconstitutional
14  customs and practices permeating the COUNTY Jails.

15        164.   In 2023, James Evans was found unresponsive in his cell at MCJ.  Mr.
16  Evans had been experiencing a medical emergency from the date of his booking on
17  August 21, 2023, and until October 1, 2023.  Mr. Evans suffered from a seizure
18  disorder, which was life-threatening if left untreated.  Despite the MCJ custody and
19  medical staff knowing that Mr. Evans was suffering from a medical emergency, Mr.
20  Evans was refused medical care, leading to his death on October 1, 2023.  The custody
21  and medical staff's failure to provide medical care to Mr. Evans was a result of the
22  unconstitutional customs and practices permeating the COUNTY Jails.

23        165.   In 2023, Kamren Nettles was found unresponsive in his cell at MCJ.  Mr.
24  Nettles had been experiencing a medical emergency in his cell for an appreciable
25  amount of time on May 13, 2023. Upon information and belief, MCJ custody staff
26  failed to properly conduct a proper Title 15 welfare and safety check, resulting in Mr.
27  Nettles' death. Mr. Nettles' death was a result of the unconstitutional customs and
28  practices permeating the COUNTY Jails.

166.   "[A] jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment." *Thompson,* 885 F.2d at 1448. The 1979 Judgment similarly provides that "every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep." *Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576 (1984). The 1992 Stipulation and the 2005 Order reiterate this requirement, set out a procedure for recording floor sleepers, and incorporate the State of California's minimum requirements for county jails from Titles 15 and 24 of the California Code of Regulations. *Rutherford*, 2005 WL 3388141, at *1 ¶¶ 1-3, 5.

167.   An order directed the CDCR to reduce its population in 2009, wherein the Supreme Court observed: Crowding also creates unsafe and unsanitary living conditions that hamper effective delivery of medical and mental health care. A medical expert described living quarters in converted gymnasiums or dayrooms, where large numbers of prisoners may share just a few toilets and showers, as breeding grounds for disease. Cramped conditions promote unrest and violence, making it difficult for prison officials to monitor and control the prison population. . . Crowding may also impede efforts to improve the delivery of care. *Brown v. Plata*, 563 U.S. at 519-521 (2011).

168.   Almost fifty (50) years ago, the IRC's crowding was described as "a repelling experience" and "a spectacle" compared to "an overcrowded pig pen." *Rutherford*, 457 F. Supp. at 114. As stated above, Plaintiffs in the *Rutherford* case have shown that on occasion, hundreds of people are held at the IRC, night after night, without blankets and a mattress, let alone a bed. The fact that hundreds of incarcerated persons have gone days without a bed, bunk, or mattress unquestionably violates orders of this Court, the 1979 Judgment, and constitutional and statutory requirements. It is evident that not only the amount of people in the IRC repeatedly has exceeded capacity, but also that the quantity of individuals crammed in the IRC for days on end creates toxic living conditions. Despite this, these issues have not subsided in these nearly fifty

1    (50) years, nor did they subside in time to save the life of ROGER MORALES.  As

2    was stated earlier, it was clear that ROGER MORALES spent some of his last moments

3    not on a bed, where he should have been to sleep, but rather on the floor.

4        169.   In the Ninth Circuit, an incarcerated person may show a "serious medical

5    need by demonstrating that failure to treat a prisoner's condition could result in further

6    significant injury or the unnecessary and wanton infliction of pain." *Akhtar v. Mesa*,

7    698 F.3d 1202, 1213 (9th Cir. 2012). Healthcare conditions that significantly affect a

8    person's daily activities or result in chronic and substantial pain are serious medical

9    needs, even if they are not immediately life-threatening. *McGuckin v. Smith*, 974 F.2d

10   1050, 1059-60 (9th Cir. 1992). This precedent establishes that because ROGER

11   MORALES was not provided immediate medical attention once he fell from his

12   wheelchair, was having difficulty breathing, was hypotensive, and with an alerted

13   mental state, this would qualify as deliberate indifference to his medical needs.

14       170.   Despite being in a "clinic," IRC detainees have inconsistent access to care.

15   Many are denied medication they were prescribed and taking before arrest, with

16   dangerous effects. The overcrowding itself makes it "difficult" for deputies to observe

17   people despite this being part of their duties. Most importantly, in the span of only 3

18   months, from April to June of 2022, two people died in the IRC. These failures meet

19   both the Eighth Amendment standard of deliberate indifference as well as the

20   Fourteenth Amendment standard for pretrial detainees.

21       171.   Defendants cannot dispute that IRC conditions run afoul of multiple past

22   Court orders and judgments, nor can they dispute that courts have the power to issue

23   further enforcement orders to force a party to comply with past judgments or

24   settlements. The IRC conditions clearly violate their constitutional rights when they

25   are "treated in a way antithetical to human dignity." *Hope v. Pelzer*, 536 U.S. 730, 744-

26   45 (2002). The rights of pretrial detainees "are analyzed under the Fourteenth

27   Amendment Due Process Clause, rather than under the Eighth Amendment." *Frost v.*

28   *Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (*citing Bell v. Wolfish*, 441 U.S. 520, 535

n.16 (1979)). The Fourteenth Amendment is more protective than the Eighth Amendment "because the Fourteenth Amendment prohibits *all* punishment of *pretrial detainees*." *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020) (emphasis in original) (*quoting Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004)). A jailer's conduct constitutes punishment if it is either not rationally related to a legitimate, nonpunitive government purpose, or is excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Demery*, 378 F.3d at 1030-33.40 This requires showing at least reckless disregard by jail officials for detained persons' health or safety. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).

172.   Before October 26, 2023, high-level COUNTY supervisors, including SHERIFF LUNA, knew or should have known of the years of ongoing failure to provide incarcerated persons timely and reasonable medical health care, knew or should have known of inadequate and/or incompetent staffing, insufficient and inadequate cells and beds, incompetent and inadequate provision of health care and delivery thereof, denying access to outside hospitals or other health programs, failure to take corrective measures, including ignoring judicial orders to abate or take corrective action regarding medical and mental health care to pretrial detainees, notice from quality assurance and death reviews, from litigation alleging failure to provide reasonable medical and mental health care, and from publications of endemic, ongoing and unabated risks of injury or death to incarcerated persons. The number of lawsuits against the COUNTY and throughout the state and the evidence available from those actions is troubling and demonstrative of Defendants' years of deliberate indifference to known ongoing hazards to ill detainees, such as ROGER MORALES, and their failure to take corrective action.

173.   Based on this information stated above, it's clear that the death of ROGER MORALES was part of a custom that could have been corrected by Defendants years before he even reached COUNTY facilities in August of 2023.

**COMPLAINT FOR DAMAGES**

174.   Further, upon information and belief, Custody Deputies were authorized to submit inaccurate and incomplete Title 15 Welfare and Safety Check reports that include no actual observations of ROGER MORALES' condition in what would be some of his final moments.

175.   Correctional Health Services Policy M202.04, Emergency Response – Inmate or Person Down, mandates that staff take immediate and decisive action to address any medical emergencies. However, the policy's definition of "aggressive" assistance is vague and insufficient to protect inmates in critical need. Despite this requirement, custody staff stood by as ROGER MORALES exhibited unmistakable signs of severe medical distress, including high fever, respiratory problems, dangerously low blood pressure, rapid heart rate, mental confusion, and visible bruising and open sores on his lower extremities. This inaction is a constitutional violation of ROGER MORALES' right to be free from harm and receive adequate medical care. These deputies failed to conduct genuine "safety checks" or respond to his obvious distress. Any reasonable officer, faced with such alarming symptoms, would have provided immediate medical assistance. Their failure to act was not only negligent—it was a blatant disregard for his life and well-being.

176.   The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY, LACSD, and LACDHS were a moving force and/or a proximate cause of the deprivations of ROGER MORALES' clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983. Defendants subjected ROGER MORALES to their wrongful conduct, depriving ROGER MORALES of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of ROGER MORALES, Plaintiffs, and others would be violated by their acts and/or omissions.

177.   As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants COUNTY, LACSD, and LACDHS, as described above, ROGER MORALES suffered serious injuries and death.

178.   Plaintiffs are entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY, LACSD, and LACDHS.

## XII.   FIFTH CAUSE OF ACTION

### Supervisory Liability Causing Constitutional Violations

### (Failure to Properly Train, Supervise and Discipline – 42 U.S.C. § 1983)

### By Plaintiff ESTATE OF ROGER MORALES As Against

### Defendants ROBERT LUNA and DOES 8 Through 10

179.   Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

180.   At all material times, SHERIFF LUNA and DOES 8 through 10 had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the COUNTY and LACSD.

181.   SHERIFF LUNA and DOES 8 through 10 failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including DOES 1 through 10 and other COUNTY and LACSD personnel, with deliberate indifference to Plaintiffs', ROGER MORALES', and others' constitutional rights, which were thereby violated as described above.

182.   As supervisors, SHERIFF LUNA and DOES 8 through 10 permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control. They failed to properly supervise these individuals, acting with deliberate indifference to the rights of incarcerated individuals at MCJ and IRC to safety, protection, and access to necessary medical care, including the serious

**COMPLAINT FOR DAMAGES**

medical needs of ROGER MORALES. Supervising Defendants either directed his or her subordinates in conduct that violated ROGER MORALES' rights or set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive ROGER MORALES of his rights or knew his or her subordinates were engaging in acts likely to deprive ROGER MORALES of rights and failed to act to prevent his or her subordinate from engaging in such conduct, or disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate ROGER MORALES' rights, and did cause the violation of ROGER MORALES' rights. (*See*, Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable for their failures to intervene in their subordinates' apparent violations of ROGER MORALES' rights.

183.   The unconstitutional customs, policies, practices, and/or procedures of Defendants COUNTY, LACSD, and LACDHS, as stated herein, were directed, permitted, allowed, and/or ratified by policymaking officers for Defendants COUNTY, LACSD, and LACDHS, including Defendants SHERIFF LUNA and DOES 8 through 10, respectively, with deliberate indifference to Plaintiff's, ROGER MORALES', and others' constitutional rights, which were thereby violated as described above.

184.   The unconstitutional actions and/or omissions of Defendants DOES 1 through 10 and other COUNTY, LACSD, and LACDHS personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY, LACSD, and LACDHS, including Defendants SHERIFF LUNA and DOES 8 through 10.

185.   As alleged above, since 2023, LACSD COUNTY Jails have resulted in seventy-five (75) in-custody deaths. The deaths include eleven (11) overdoses, four (4) homicides resulting from inmate-on-inmate violence, three (3) suicides, twenty (20) "natural cause" deaths, two (2) undetermined deaths, and five (5) accidental deaths.

**COMPLAINT FOR DAMAGES**

186.   In 2023, Defendant SHERIFF LUNA was the top Sheriff of the LACSD tasked with ensuring that his jail was free of unreasonable risks of harm, free of deliberate indifference to medical care, and free from negligent deputies who caused constitutional violations. However, despite SHERIFF LUNA being responsible for upholding such constitutional rights, SHERIFF LUNA not only acquiesced in the violations of rampant constitutional rights, SHERIFF LUNA knew of deputies' constitutional violations and failed to act to terminate acts by his subordinates.

187.   Worse yet, given that so many jail deaths occurred under SHERIFF LUNA's watch, and in the same year that ROGER MORALES died, SHERIFF LUNA disregarded obvious consequences of the conduct of his subordinate deputies, which were the death and constitutional violations of many. Indeed, SHERIFF LUNA's conduct showed reckless indifference to the deprivation by deputies within LACSD Jails, such that it was a violation of the rights of others, including ROGER MORALES. Therefore, SHERIFF LUNA is clearly liable under a supervisory liability theory.

188.   Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to SHERIFF LUNA and DOES 8 through 10 and that such Defendant policymakers have direct knowledge of the fact that the death of ROGER MORALES was not justified or necessary, but represented deliberate indifference to his rights to be protected and safe while in the COUNTY's custody and his rights to his serious medical health needs, as set forth above. Notwithstanding this knowledge, on information and belief, SHERIFF LUNA and DOES 8 through 10 have approved and ratified of the conduct and decisions of DOES 1 through 10 in this matter and have made a deliberate choice to endorse such conduct and decisions and the basis for them, that resulted in the death of ROGER MORALES. By so doing, SHERIFF LUNA and DOES 8 through 10 have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.

**COMPLAINT FOR DAMAGES**

1    189.   Furthermore, Plaintiffs are informed and believe, and thereupon allege,
2    that SHERIFF LUNA and DOES 8 through 10 and other policymaking officers for the
3    COUNTY and LACSD were and are aware of a pattern of misconduct and injury, and
4    a code of silence caused by COUNTY and LACSD custody, medical and mental health
5    staff personnel similar to the conduct of Defendants described herein, but failed to
6    discipline culpable law enforcement officers and employees and failed to institute new
7    procedures and policy within the COUNTY and LACSD.

8    190.   Defendants SHERIFF LUNA and DOES 8 through 10, as policymaking
9    officers for the COUNTY and LACSD, are required by their policies and procedures
10   to make emergency referrals. Specifically, here, Correctional Health Services Policy
11   M230.03 requires that Medical Services Bureau personnel identify those patients
12   requiring a provider evaluation and provide access for these patients in accordance with
13   Title 15 Welfare and Safety Checks. Urgent Referrals refer to patients who have
14   medical complaints or conditions that need to be addressed within 24 hours. Emergent
15   Referrals refer to patients with medical complaints or conditions that need to be
16   addressed as an emergency, and the complaint may be life-threatening.

17   191.   Upon information and belief, ROGER MORALES informed the staff that
18   he was having breathing problems—a condition that unequivocally demanded
19   immediate medical intervention. Such symptoms are universally recognized as
20   requiring emergency care[24] and should have necessitated, at the very least, an Emergent
21   Referral. With this critical information, and given Mr. Morales's medical history of
22   hypertension and prediabetes, Defendants SHERIFF LUNA and DOES 8 through 10
23   were fully aware of the potential risks faced by anyone entering COUNTY facilities.
24   Despite this knowledge, Defendants SHERIFF LUNA and DOES 8 through 10, as
25   policymaking officers, failed to use this information to ensure these policies were being
26   adhered to. These policies were thus not followed and failed to ensure ROGER

---

[24] *See* https://medlineplus.gov/ency/article/000007.htm

**COMPLAINT FOR DAMAGES**

1  MORALES' medical needs were met by SHERIFF LUNA and DOES 8 through 10 as

2  policymaking officers.

3      192.    SHERIFF LUNA acted as a policy maker and was aware of the necessity

4  to ensure those who work under him, such as DOES 8 through 10, followed these

5  procedures. Vast stakes hang in the distance, with more unnecessary deaths, seventy-

6  five (75) in-custody deaths since 2023, looming as a possibility from a failure to follow

7  policies. Plaintiffs establish that supervisory liability was established through a causal

8  connection because SHERIFF LUNA, as a supervisor, failed to terminate the acts of

9  his subordinates despite being aware that these policies were not being followed.

10     193.    Upon information and belief, SHERIFF LUNA knew or should have

11 known about the danger posed by failure to follow medical procedures, specifically

12 medical referrals, because, as Sheriff, he received several reports in the *Rutherford*

13 actions on the deaths of other incarcerated persons who died due to failure to be

14 properly medicated, referred, and most painfully of all, assisted.  Indeed, the *Rutherford*

15 action filed in September 2022 painfully details the horrendous conditions existing at

16 the IRC.

17     194.    Despite seventy-five (75) in-custody deaths since 2023, SHERIFF LUNA

18 never showed any endeavors or attempts towards improvement of the policies that he

19 was to follow and instructed his subordinates to follow. Regardless of being aware that

20 the next person who would become incarcerated was at risk, there were no efforts given

21 to ensure that new policies would be implemented to ensure their medical safety or

22 prevent their death.

23     195.    Finally, it would be unreasonable to conclude that SHERIFF LUNA was

24 unaware of the pattern of detainees dying in his Jails. If a policy maker such as

25 SHERIFF LUNA were to never question why such an alarming rate of individuals are

26 dying at the hands of the COUNTY and LACSD, then it is evident policymakers for

27 the COUNTY and LACSD are not only reckless but also not supervising their

28 subordinates. SHERIFF LUNA, because he knew of the deaths that were occurring

1  under him, should have addressed and/or terminated the series of acts by others, which

2  he was aware were causing the deaths of incarcerated individuals such as ROGER

3  MORALES.

4       196.   In the *USA v. County of Los Angeles, et al*. lawsuit, the in-custody deaths

5  occurring then were proven to be a consequence of various constitutional violations

6  and were meant to be reformed. The reform was designed to prevent and respond more

7  effectively to health concerns. As such, SHERIFF LUNA knew or should have known

8  that these acts caused by his subordinates' unconstitutional actions were possible.

9  Additionally, SHERIFF LUNA knew or should have known these unconstitutional acts

10  could risk the life of any person who would find themselves incarcerated, including a

11  vulnerable person such as ROGER MORALES.

12       197.   The aforementioned customs, policies, practices, and procedures; the

13  failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate,

14  investigate, and discipline; and the unconstitutional orders, approvals, ratification, and

15  toleration of wrongful conduct of SHERIFF LUNA and DOES 8 through 10 were a

16  moving force and/or a proximate cause of the deprivations of ROGER MORALES'

17  clearly established and well-settled constitutional rights in violation of 42 U.S.C. §

18  1983, as more fully set forth above.

19       198.   Defendants subjected ROGER MORALES to their wrongful conduct,

20  depriving ROGER MORALES of rights described herein, knowingly, maliciously, and

21  with conscious and reckless disregard for whether the rights and safety of ROGER

22  MORALES and others would be violated by their acts and/or omissions.

23       199.   As a direct and proximate result of the unconstitutional actions, omissions,

24  customs, policies, practices, and procedures of SHERIFF LUNA and DOES 8 through

25  10 as described above, Plaintiff sustained serious and permanent injuries and is entitled

26  to damages, penalties, costs, and attorneys' fees.

27  ///

28  ///

**COMPLAINT FOR DAMAGES**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XIII.    SIXTH CAUSE OF ACTION

### Negligence – Wrongful Death

### By All Plaintiffs As Against All Defendants

200.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

201.    At all times, DOES 1 through 10 owed Plaintiffs and ROGER MORALES the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

202.    At all times, DOES 1 through 10 owed Plaintiffs and ROGER MORALES the duty to act with reasonable care.

203.    These general duties of reasonable care and due care owed to Plaintiffs and ROGER MORALES by DOES 1 through 10 include but are not limited to the following specific obligations:

    a.    To summon or transport ROGER MORALES to necessary and appropriate emergency medical and mental health care;

    b.    To refrain from unreasonably creating danger or increasing ROGER MORALES' risk of harm;

    c.    To use generally accepted law enforcement procedures and tactics that are reasonable and appropriate for ROGER MORALES' status as a person in a medical and mental health crisis with serious medical and mental health needs;

    d.    To conduct state-mandated safety and welfare checks of inmates in the custody of the COUNTY Jails;

    e.    To refrain from abusing the authority granted to them by law; and

    f.    To refrain from violating Plaintiffs' and ROGER MORALES' rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

204.  Defendants DOES 1 through 10, through their acts and omissions, breached each of the aforementioned duties owed to Plaintiffs and ROGER MORALES.

205.  Defendants COUNTY and LACSD are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

206.  As a direct and proximate result of Defendants' negligence, Plaintiffs and ROGER MORALES sustained injuries and damages, and against each Defendant named in this cause of action in their individual capacities are entitled to relief, including punitive damages against such individual Defendants.

## XIV.    SEVENTH CAUSE OF ACTION

### Negligence – Medical Malpractice

### By Plaintiff ESTATE OF ROGER MORALES As Against

### Defendants DOES 1 Through 10

207.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

208.  The present cause of action is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under Section 820 of the Government Code, as public employees, DOES 1 through 10, inclusive, are liable for injuries caused by their acts or omissions to the same extent as private persons. Under Section 815.2 of the Government Code, as public entities, Defendants COUNTY, LACSD, and LACDHS are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This cause of action is not alleging direct liability against Defendants COUNTY, LACSD, and LACDHS, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

209.  ROGER MORALES was under the care and treatment of DOES 1 through 10, all of whom were COUNTY medical staff assigned to the COUNTY Jails,

including MCJ and IRC, who were required to examine, treat, monitor, prescribe for, and care for him and to provide him with medical attention when he suffered a medical emergency. These Defendants, acting within the scope and course of their employment with COUNTY, LACSD, and LACDHS, negligently, carelessly, and unskillfully cared for, attended, handled and controlled; failed to monitor and follow-up; abandoned; failed to classify, failed to appropriately diagnose and/or refer ROGER MORALES to specialist medical care providers; negligently failed to provide physician care; carelessly failed to detect, monitor, and follow-up with his condition; and negligently, carelessly and unskillfully failed to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by others in the same profession and the same locality as Defendants for the benefit of their patient and dependent pre-trial detainee ROGER MORALES.

210.  Specifically, Correctional Health Services Policy M202.04, Emergency Response – Inmate or Person Down, states that "it is incumbent upon Medical Services Bureau staff to aggressively respond to declared medical emergencies in or near the various facilities and to render care and treatment to the best of their ability, within their scope of practice." Even if DOES 1 through 10 did not consider ROGER MORALES to be experiencing a medical emergency, their Correctional Health Services Policy M202.04 then states, "When staff are presented by Custody with an inmate for medical evaluation, who is not a "person down" or whole condition is not emergent in nature, it is their responsibility to follow through to ensure appropriate disposition or follow up." As examined above, ROGER MORALES' condition would likely be classified as Emergent.

211.  Despite these policies, nothing in DOES 1 through 10 behavior suggests that they acted "aggressively" to address the medical emergency that ROGER MORALES was experiencing before being rushed to the hospital. For all interactions, DOES 1 through 10 failed to take decisive action to address the fact that ROGER MORALES was experiencing severe difficulty breathing, was hypotensive, and had an

altered mental state—conditions that should have triggered immediate and rigorous medical intervention. Instead, they neglected to ensure proper disposition and follow-up, demonstrating a blatant disregard for his critical condition. This failure to follow up and to follow procedure were both negligent acts that cost ROGER MORALES precious time and, disturbingly, his life.

212.   Each of the Defendant supervisors failed to supervise, train, and monitor their subordinates, to maintain proper supervision, classification, and staffing, to timely provide ROGER MORALES emergency medical and mental health care, failed to provide adequate and competent staffing, and to ensure the care and treatment ordered for ROGER MORALES was provided.

213.   As a direct and legal result of the aforesaid negligence and carelessness of Defendants' actions and omissions, Plaintiffs sustained injuries and damages against these Defendants, and each of them is entitled to compensatory damages and as applicable to this claim for Medical Negligence, to be proven at the time of trial.

214.   Defendants COUNTY, LACSD, and LACDHS are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

## XV.   EIGHTH CAUSE OF ACTION

### Violation of California Government Code § 845.6

### By Plaintiff ESTATE OF ROGER MORALES As Against All Defendants

215.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

216.   ROGER MORALES required immediate medical care and treatment and DOES 1 through 10, each failed to take reasonable action to summon immediate medical care and treatment. Indeed, DOES 1 through 10 further deliberately failed to summon immediate medical care, given that they should have known about ROGER MORALES' dire medical condition. DOES 1 through 10 knew or should have known

that ROGER MORALES required immediate medical attention because he exhibited clear signs of distress such as difficulty breathing, hypotensive, and an alerted mental state. ROGER MORALES was having difficulty breathing days before he was ultimately sent to the hospital, yet DOES 1 through 10 failed to provide medical care.

217.   As a direct and proximate result of the aforementioned acts of these Defendants, ROGER MORALES was injured as set forth above, and their losses entitle Plaintiff to all damages allowable under California law. Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law, including punitive damages against these individual Defendants.

218.   Each such individual defendant, employed by and acting within the course and scope of his/her employment with COUNTY, LACSD, and LACDHS, knowing and/or having reason to know of ROGER MORALES' need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

219.   Defendants COUNTY, LACSD, and LACDHS are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

## XVI.   NINTH CAUSE OF ACTION
### Violation of California Civil Code §52.1
### (Tom Bane Act)
### By Plaintiff ESTATE OF ROGER MORALES As Against All Defendants

220.   Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this Complaint and any subsequent paragraphs.

221.   Plaintiffs bring the claims in this cause of action as a survival claim permissible under California law, including Cal. Code of Civ. Proc. § 377.20 *et. seq.*

222.   By their acts, omissions, customs, and policies, DOES 1 through 10, each acting in concert/conspiracy, as described above, while ROGER MORALES was in

custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated ROGER MORLES's rights under California Civil Code § 52.1 and the United States Constitution and California Constitution as follows:

    a. The right to be free from objectively unreasonable treatment and deliberate indifference to ROGER MORALES' serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

    b. The right for the familial association to be free from government interference as secured by the Fourteenth Amendment to the United States Constitution;

    c. The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1; and

    d. The right to emergency medical and mental health care as required by California Government Code §845.6.

223. DOES 1 through 10's violations of ROGER MORALES' due process rights with deliberate indifference, in and of themselves, constitute violations of the Bane Act. Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of ROGER MORALES' rights as described above, Defendants violated ROGER MORALES' rights by the following conduct constituting threat, intimidation, or coercion:

    a. With deliberate indifference to ROGER MORALES' serious medical and mental health needs, suffering, and risk of grave harm, including death, depriving ROGER MORALES of necessary, life-saving care for his medical needs;

    b. With deliberate indifference to hazards that posed a risk to pretrial detainees, such as ROGER MORALES;

59

c.  Subjecting ROGER MORALES to ongoing violations of his rights to prompt care for his serious medical and mental health needs over days, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being;

d.  Deliberately contracting for and causing the provision of inadequate and incompetent medical health care to COUNTY Jails detainees and inmates;

e.  Requiring medical and mental health staff to work outside their scope of practice and conduct assessments, triage, and make medical and housing decisions for patients, including ROGER MORALES, they are not competent to make and

f.  Instituting and maintaining the unconstitutional customs, policies, and practices described herein when it was obvious that in doing so, individuals such as ROGER MORALES would be subjected to violence, threat, intimidation, coercion, and ongoing violations of rights as ROGER MORALES was here.

224.  The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of ROGER MORALES' rights or any legitimate and lawful jail or law enforcement activity.

225.  Further, all of Defendants' violations of duties and rights and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

226.  Defendants owed ROGER MORALES access to healthcare as per their policies and procedures. As per Correctional Health Services Policy and Procedure M200.09, healthcare staff are responsible for initiating passes and contacting custody personnel to ensure patients receive timely access to medical and dental appointments, mental health treatment, nursing treatments, radiology examinations, laboratory tests, etc.

///

///

**COMPLAINT FOR DAMAGES**

227. Further, each Defendant violated ROGER MORALES' rights with reckless disregard and with the specific intent and purpose to deprive him of his enjoyment of those rights and the interests protected by those rights.

228. Upon information and belief, two days before his hospitalization, ROGER MORALES experienced difficulty breathing and pleaded for medical help, yet his requests were ignored by LACSD and CHS staff. Despite his clear and alarming symptoms, DOES 1 through 10 blatantly disregarded his pleas and failed to take any appropriate action. ROGER MORALES' visible symptoms—high fever, respiratory distress, dangerously low blood pressure, rapid heart rate, mental confusion, and bruising and open sores on his lower extremities—signaled an unmistakable need for immediate medical intervention. By ignoring these obvious signs, Defendants denied ROGER MORALES the critical care he desperately needed, endangering his health and safety.

229. As examined previously, the act of ignoring ROGER MORALES need for medical assistance is reckless disregard in itself. This was done with specific intent, as DOES 1 through 10 had the agency to assist ROGER MORALES and chose, consciously, to leave him suffering for hours. Without any type of assistance, it is unfathomable that ROGER MORALES would be able to exercise his rights.

230. Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

231. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of ROGER MORALES' rights under the United States and California Constitutions, Plaintiff sustained injuries and damages, and, against each Defendant, is entitled to relief, including punitive damages against all individual Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

///

**COMPLAINT FOR DAMAGES**

## XVII.    REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court enter a judgment as follows:

A.    Wrongful death of ROGER MORALES pursuant to Cal. Code of Civ. Proc. § 377.*60 et. seq*.;

B.    Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 *et. seq*.;

C.    ROGER MORALES' coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 *et. seq*.;

D.    Violation of ROGER MORALES' constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 *et. seq*. and federal civil rights law;

E.    ROGER MORALES' loss of life, pursuant to federal civil rights law;

F.    ROGER MORALES' conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

G.    General Damages, including wrongful death and survival damages, over the mandatory amount for jurisdiction in the Unlimited Superior Court;

H.    Non-Economic Damages, including wrongful death and survival damages, according to proof, plus all further and proper relief;

I.    Punitive damages as to individual peace officer defendants;

J.    Attorney's fees pursuant to State Law (Cal. Code Civ. Proc. § 1021.5 and private attorney general doctrine);

K.    Penalties under the Tom Bane Act;

L.    Interest; and

M.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 *et. seq*., 377.60 *et. seq*., and 1021.5; California Civil Code §§ 52

**COMPLAINT FOR DAMAGES**

1    *et. seq.*, 52.1; and as otherwise may be allowed by California and/or

2    federal law.

3

4    Dated: November 21, 2024          **LAW OFFICES OF CHRISTIAN CONTRERAS**
                                        **A PROFESSIONAL LAW CORPORATION**
5

6                                      By: _____

7                                      Christian Contreras, Esq.
                                       Attorney for Plaintiffs,
8                                      ESTATE OF ROGER MORALES, et al.

9

10                      **DEMAND FOR JURY TRIAL**

11        Plaintiffs, ESTATE OF ROGER MORALES and PAULINE MORALES,

12   hereby make a demand for a jury trial in this action.

13

14   Dated: November 21, 2024          **LAW OFFICES OF CHRISTIAN CONTRERAS**
                                        **A PROFESSIONAL LAW CORPORATION**
15

16                                     By: _____

17                                     Christian Contreras, Esq.
                                       Attorney for Plaintiffs,
18                                     ESTATE OF ROGER MORALES, et al.

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES**